LANCASTER et al. v. COX.   (No. 3081.)

(Court of Civil Appeals of Texas.   Texarkana.
June 2, 1925.   Rehearing Denied
June 11, 1925.)

1. **Evidence ⬨◯474(7)—Witness held qualified to give an opinion as to carrying power of substituted light on locomotive.**

Witness *held* qualified to give an opinion as to carrying power of substituted light on locomotive, though he had never ridden in the cab of a locomotive at night and observed how headlight illuminated way ahead where he had noticed how headlights on passing locomotive illuminated track, and had driven automobiles at night, and observed how lights used on same illuminated road ahead.

2. **Appeal and error ⬨◯1050(1)—Any error in permitting witness to give opinion as to carrying power of substituted light on locomotive held not reversible.**

Any error in permitting witness to give an opinion as to carrying power of substituted light on locomotive, in that he was not qualified, *held* not to require a reversal, where other parts of his testimony to same effect, substantially, as that objected to, were not objected to, and other witnesses testified to practically same effect without objection.

3. **Evidence ⬨◯539½(1)—Witness held qualified to give an opinion whether wheels of locomotive tender in conformity with rule promulgated by Interstate Commerce Commission.**

Witness *held* qualified to give an opinion that wheels on tender of locomotive were not in conformity with rule promulgated by Interstate Commerce Commission, though he did not have a gauge at time he examined them, and was not testifying from tests he made with the gauge, but from way flanges appeared to him, where he had acquired knowledge of flanges of such wheels during five or six months he had worked at railroad shops repairing cars and wheels on cars.

4. **Evidence ⬨◯539½(1)—Witnesses held competent to give an opinion that switch was closed when locomotive passed over it, and that it was split and opened by wheels of tender.**

Witnesses *held* competent to give an opinion, to effect that switch was closed when locomotive passed over it, and was split open by wheels of tender, where each of them had many years experience as a locomotive engineer.

5. **Evidence ⬨◯500—Witnesses' testimony with reference to switch light not rendered inadmissible because given in reference to model produced in courtroom.**

In action for death of locomotive fireman, when engine was derailed at switch, testimony of witnesses as to how far they could see red lens on switch light, and that there could not be any opening in switch points without showing red signal in switch light, was not rendered inadmissible because given in reference to model of switch produced in courtroom.

6. **Trial ⬨◯352(4)—Refusal to submit issue not supported by evidence is not error.**

Refusal to submit issue not supported by evidence is not error.

7. **Trial ⬨◯351(5)—Refusal to submit issues covered by other issues given is not error.**

Refusal to submit issues covered by other issues and instructions given is not error.

8. **Trial ⬨◯335—That jury was required to state separately respective amounts plaintiff and minor children entitled to recover, in action for death, was not reversible error.**

In action for death of locomotive fireman, that court required jury to state separately respective amounts that wife of decedent and his minor children were entitled to recover did not constitute reversible error.

9. **Death ⬨◯99(4)—$35,000 for death of locomotive fireman held not excessive.**

Verdict of $35,000 for death of locomotive fireman *held* not excessive, where deceased was 48 years of age, had a life expectancy of 22 years, was in good health and devoted to his family, and earning regularly from $250 to $265 per month, and left surviving him nine minor children.

10. **New trial ⬨◯144—Evidence held not to show that jury was guilty of misconduct.**

Evidence *held* not to show that jury was guilty of misconduct, in that they discussed effect answers they made to issues submitted to them would have on right of plaintiff to recover, and that, in determining amount of damages plaintiff was entitled to recover, they considered amount awarded to another plaintiff in another case, and amount plaintiff would have to pay as attorney's fees out of sum adjudged in her favor.

Appeal from District Court, Wood County;  J. R. Warren, Judge.

Action by Mrs. Viola Cox, temporary administratrix of the estate of Charles E. Cox, deceased, against J. L. Lancaster and others, receivers. Judgment for plaintiff, and defendants appeal. Affirmed.

On the night of November 24, 1922, Charles E. Cox, while working as fireman of the locomotive of the "Sunshine Special," a train operated by appellants as receivers over the Texas & Pacific Railway Company's line of railway, was killed in a wreck of the train at a point a few miles west of Mineola, known as "Mack's Switch." This suit for damages for the death of said Cox was commenced and prosecuted by appellee (his widow), as the temporary administratrix of his estate, for her own benefit, and for the benefit of minor children of the marriage between her and the deceased, nine in number.

At the time the accident occurred, appellants were engaged and the deceased was employed in interstate commerce. The train was moving east. The engine passed over the switch and continued on the main line track

⬨◯For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to a point about 100 yards east of the switch, where it turned over, but the tender of the engine and cars forming part of the train left the main line track at the switch and moved on to the right thereof.

In response to special issues submitted to them, the jury found as follows:

(1) The switch in question was tampered with or displaced by one Josh Johnson. His act was unauthorized and was a proximate cause of the death of the deceased.

(2) A wheel or wheels of the tender of the locomotive had "a sharp flange or flanges as the term 'sharp flange' was defined in the charge," and such condition of the flange or flanges, concurring, as it did, with the unauthorized displacement of the switch, was "the proximate concurring cause, or a proximate concurring cause, of the death of the deceased."

(3) "The engineer of the train, at the time and on the occasion in question, while approaching or attempting to pass Mack's Switch" ran the locomotive "at an excessive, unreasonable, and dangerous speed," and was guilty of negligence in so running it, which, "concurring, as it did, with the unauthorized tampering with and displacement of the switch," was "the proximate concurring cause or a proximate concurring cause of the death of the deceased."

(4) The locomotive did not "have a headlight sufficient to enable a person in the cab of the engine, with the usual visual capacity required of locomotive engineers, to see, in a clear atmosphere, at the time and on the occasion in question, a dark object as large as an average sized man standing erect at least 800 feet ahead and in front of such headlight," and "the failure of the engine to have such a headlight, concurring, as it did, with the unauthorized tampering with or displacement of the switch," was "the proximate concurring cause or a proximate concurring cause of the death of the deceased."

(5) "The engineer of the locomotive, while approaching and attempting to pass Mack's Switch, at the time and on the occasion in question," was negligent, in that he "did not exercise ordinary care to keep a reasonable watchful and efficient lookout ahead to observe and discover whether the switch was displaced or open, or otherwise in a dangerous condition" and his negligence, "concurring, as it did, with the unauthorized tampering with or displacement of the switch," was "the proximate concurring cause or a proximate concurring cause of the death of the deceased."

(6) "The signal contrivance and the switchstand at the west end of Mack's Switch" were "defective and out of proper alignment, and not reasonably safe for the deceased and other enginemen in the service of the defendants, at the time and on the occasion in question," and defendant was guilty of negligence in permitting same to be in such a condition, and "such negligence, concurring, as it did, with the unauthorized tampering with or displacement of the switch," was "the proximate concurring cause or a proximate concurring cause of the death of the deceased."

(7) Fair and reasonable compensation for the pecuniary loss to the widow of the deceased was $10,000, and to his minor children sums as follows: Mary Cox, $4,780; Bart Cox, $3,780; George Cox, $3,280; Dorothy Cox, $3,130; Albert Cox, $2,780; Martile Cox, $2,280; Charles Cox, $1,780; Martha Cox, $1,680; Robert Cox, $1,510.

On the findings made, the court rendered judgment in appellee's favor as temporary administratrix, for her own use and the use of the minors as specified, for the sums specified, aggregating $35,000, and thereupon appellants prosecuted this appeal.

The sufficiency of the testimony to support the findings, other than the one as to the amount of the damages, is not questioned by any of the assignments in appellants' brief.

R. S. Shapard and Geo. Thompson, both of Dallas, Head, Dillard, Smith, Maxey & Head, of Sherman, and Jones & Jones, of Mineola, for appellants.

Johnson, Edwards & Hughes, of Tyler, W. C. Shoults, of Longview, and Bozeman & Cathey, of Quitman, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] One of the issues presented by the pleadings in the case was as to whether appellants violated a rule of the Interstate Commerce Commission requiring a locomotive used in road service between sunset and sunrise to have a headlight which would afford sufficient illumination to enable a person in the cab of the locomotive, possessing the "usual visual capacity required of locomotive engineers, to see, in a clear atmosphere, a dark object as large as a man of average size standing erect at a distance of at least 800 feet ahead and in front of such headlight."

There was testimony that the headlight "would not light up" at Terrell, a station west of the place where the wreck occurred, and that the smokestack light without the headlight reflector was used instead. With reference to the illumination furnished by the substituted light, the witness Carroll, over appellants' objection, was permitted to testify that he did not believe a person in the cab could "have recognized or observed" an object like that specified in the rule a greater distance then 200 feet ahead. The ground of the objection to the testimony was that it did not appear that the witness was qualified to give an opinion as to the carrying power of the substituted light. The witness testified that, while he had never ridden in the cab of a locomotive at night and observed

how the headlight illuminated the way ahead, he had noticed how headlights of passing locomotives illuminated the track, and had driven automobiles at night and observed how lights used on same illuminated the road ahead.

It may be that the experience the witness had had did not qualify him as an "expert," but we think it did qualify him to testify as he did. We do not think only experts could give such testimony. Railway Co. v. Thomason, 59 Ark. 140, 26 S. W. 598; St. Louis, M. & S. E. R. Co. v. Shannon, 76 Ark. 166, 88 S. W. 851; 22 C. J. 565. In the Thomason Case, where a witness who had never been on a locomotive at night was permitted to give testimony substantially like that given in this case by the witness Carroll, the Supreme Court of Arkansas said:

"We can see nothing in the distance or range of the reflection of light by the headlight of an engine calling for the exercise of peculiar skill, the possession of professional knowledge, or requiring any peculiar habit of study, in order to qualify a person to understand it, and to testify about it intelligently. The witness was testifying to matters of fact which he says he had observed, and about which men of common understanding might be informed upon observation. Any person cognizant of the facts upon which he bases his judgment may give his opinion on questions of identity, size, weight, distance, and time. Such questions are open to all men of ordinary information. The evidence is competent. Its weight is for the jury."

[2] But, if we thought the action of the trial court in admitting the testimony in question was error, we would not think the error required a reversal of the judgment. Other parts of the testimony of the witness Carroll to the same effect, substantially, as that objected to, were not objected to, and the witnesses Herrin, Carter, and others testified to practically the same effect without objection. Guarantee Mercantile Co. v. Jefferson Union Cotton Warehouse Co. (Tex. Civ. App.) 247 S. W. 601.

[3, 4] Another issue made by the pleadings was as to whether appellants, with respect to wheels of the tender, had violated a rule promulgated by said Interstate Commerce Commission condemning wheels with flanges "having flat vertical surfaces extending one inch or more from the tread, or flanges fifteen-sixteenths inches thick or less gauged at a point three-eighths inch above the tread." On his direct examination by appellee the witness William Cox testified that he found, on inspecting the wheels of the tender, that two of them had sharp flanges and flat vertical surfaces, and "would take the gauge," meaning a gauge used for determining whether flanges were within the condemned class or not. A flange that "would take the gauge" was within that class. It appeared on appellants' cross-examination of the witness

that he did not have a gauge at the time he examined the wheels, and was not testifying from tests he made with a gauge, but from the way the flanges appeared to him. Thereupon appellants moved the court to exclude the testimony specified, on the ground that it was the opinion or conclusion of the witness, and complain here because the court overruled their motion. We think it appeared from other testimony of the witness that knowledge he had acquired of the flanges of such wheels during the five or six months he had worked in appellants' shops at Marshall, repairing cars and wheels on cars, entitled appellee to have him to testify as he did, and so as to the testimony objected to of the witnesses Wilkes, Eason, Reeves, Allison, and Bell to the effect that the switch was closed when the locomotive passed over it, and was split and opened by wheels of the tender. Each of the witnesses named had had many years' experience as a locomotive engineer, and we think it satisfactorily appeared that he was an "expert" as to the matter he testified about.

[5] The ninth assignment in appellants' brief is that the trial court erred "in admitting over objection of the defendants and permitting the witnesses to testify and demonstrate the operation of lights, etc., of the switchstand by a model in the courtroom, and in overruling defendants' motion to exclude said testimony and demonstration as shown by defendants' bill of exception No. 20."

The proposition under the assignment is as follows:

"Experiment made by appellee in court by the exhibition before the jury, and the operation and explanation thereof made by witnesses in connection with the giving of their testimony of a purported model, which did not, and manifestly could not, represent the switchstand and switch lights and the operation thereof involved in this case at the time and under the conditions surrounding the wreck, was improper, confusing, misleading, injurious, and prejudicial to appellants."

It appears from the bill of exceptions specified in the assignment that at the trial in the court below appellee "produced in court what purported to be a wooden model of the switchstand, with the parts representing the lights painted green and red, and the staff so arranged that it could be turned by hand, and with said model in the presence of the jury, on direct examination of plaintiff's witness C. C. Wilkes, and on cross-examination of defendants' witness Stevens, over the objection of the defendants, on the ground that the conditions, situation, and circumstances were different, and could not be shown and demonstrated by placing a model that could be seen from an engine coming on the track, permitted the use of said model before the jury and said witnesses to testify how far they could see the red lens, and

that there could not be any opening in the switchpoints without showing the red or danger signal in the switch light, and after admitting said testimony, the defendants moved the court to exclude the same."

It will be noted that, according to the bill of exceptions, the only testimony appellants moved to exclude was that of the witnesses Wilkes and Stevens, given in connection with the model, "as to how far they could see the red lens, and that there could not be any opening in the switchpoints without showing the red or danger signal in the switch light." Had the testimony specified been given without reference to the model, certainly it should not have been excluded on the ground specified in the bill of exceptions, and we see no reason why it should have been excluded on that ground because it was given with reference to the model. So far as the motion was to exclude the model, and use made of it from consideration by the jury, it seems it was in effect sustained when the court instructed the jury as follows:

"Gentlemen of the jury, you recall that in the introduction of the testimony some of the jurors were called to stand up and look at the target that they had in the courtroom and view the manipulation of that. Now I instruct you not to consider that for any purpose whatever. I withdraw that testimony from the consideration of the jury; and you jurors who may have looked, why don't consider anything you saw in connection with it, or refer to it any way in your deliberations, and don't any of you other jurors consider anything about the jurors looking at the target."

[6-8] We think there is no merit in the contention that the court below erred when he refused appellants' request to submit to the jury an issue as to risk assumed by the deceased. While appellants in their answer alleged that the death of deceased was due to risk he assumed as fireman, they have not pointed out in their brief, and we have not found in the record, testimony which, as we view it, made such an issue, and we do not think said court erred when he refused to submit to the jury the special issues appellants requested with reference to the speed of the train at the time of the accident and the care exercised in maintaining the signal contrivances and switchstand. Those matters were sufficiently covered by issues and instructions with reference thereto given by the court to the jury. Nor do we think the court erred when he had the jury to "state separately the respective amounts" appellee and the minor children were entitled to recover, and certainly, if the court erred in that respect, the error was not one entitling appellants to a reversal of the judgment.

[9] The verdict of the jury is attacked in one of the assignments of error as so "grossly excessive" as to indicate that the jury were influenced by passion, prejudice, etc., in rendering it. We do not think so. The deceased was only 48 years of age when he was killed. He had a life expectancy of 22 years, was in good health, was devoted to his family, and was earning regularly from $250 to $265 per month. One of the minor children surviving him was an infant, and the others were 6, 8, 10, 11, 12, 14, 16, and 17 years of age, respectively.

[10] In their motion for a new trial, appellants charged that the jury was guilty of misconduct, which entitled them to have the verdict and judgment set aside. The misconduct charged against the jury was: (1) They discussed and considered the effect answers they made to issues submitted to them would have on the right of appellee to recover. (2) In determining the amount of damages appellee was entitled to recover, they discussed and considered the amount awarded to another plaintiff in another case, and also discussed and considered the amount appellee "would have to pay as attorney's fees" out of the sum adjudged in her favor.

As we understand the testimony adduced at the hearing on the motion, the trial court was within his right when he overruled appellants' contention. With reference to the first ground of the complaint, the juror Stokes testified that he knew affirmative answers to certain of the issues submitted to the jury would be favorable to appellee and unfavorable to appellants, and that he had that knowledge "in mind" in answering the questions, and the jurors Anders and Adrain testified to substantially the same effect, but Stokes testified further that the questions were answered "without any regard to which party would be benefited" by the answers, and "solely on the evidence." Anders testified further that he and, so far as he knew, every other juror, "answered each and every question solely according to the evidence," and that he (the juror) did not decide any question as he did because he thought it would be beneficial to appellee, and Adrain testified further that he was "governed solely by the evidence" in answering the issues submitted to the jury.

The case the jury was charged with having wrongfully discussed and considered was identified in the testimony as "the Hurdle Case" and as a suit by a husband for damages for the death of his wife. One of the jurors testified that a member of the jury mentioned the case and asked what the plaintiff therein got out of it, and that another juror answered that he got $30,000. According to the testimony of another member of the jury, when the case was mentioned the foreman declared it was not to be considered, and it was not again mentioned, and, according to the testimony of still another juror, "there wasn't but a word or two said about the Hurdle Case." Of the seven jurors called by appellants to testify at the hearing,

three testified they never heard the case mentioned, and four testified that their conduct as jurors was not influenced by the mention made of it.

The seven jurors referred to agreed that, during the time they were discussing the amount' of their verdict, mention was made as to the part appellee's attorneys might receive of a judgment in her favor, and most of the seven, if not all of them, agreed that the jury were promptly advised by their foreman that. what the attorneys might receive was not a matter for them to consider, and that no mention was thereafter made of it. It appeared from the testimony of the said jurors that, at the beginning of the discussion as to the amount of the verdict one of them favored $25,000, one $30,000 one $35,-000, two $40,000, and two $45,000. Each of the seven testified that the mention of the matter of the attorney's fees had nothing to do with his agreeing to the verdict rendered.

As we view the record, there is no error in the judgment requiring its reversal. Therefore it is affirmed.